This is the Calsonic Kansei N Amer v. Calsonic Kansei N Amer, Inc. Mr. Wade. Thank you, Your Honor. May it please the Court. Mike McIntyre was employed as a lead man in maintenance for Calsonic in the Nissan plant in Madison County, Mississippi. Calsonic was a contractor for Nissan. Calsonic had a license to use a Nissan parking lot. Nissan controlled everything about the parking lot, everything about the property. Mr. McIntyre was fired because he had a loaded, well strike that, there's an issue of fact about whether he was fired because he had a loaded firearm in his private vehicle. We file this suit based upon the Swindle case in which the Mississippi Supreme Court had disagreed with precedent from this Court and held that a Mississippi statute creates a private cause of action for a person who has a firearm in his locked vehicle in the employer's parking lot. District Judge Wingate, the issue before this Court is not one that was dealt with in the Swindle case because it concerns an exception to the statute. Judge Wingate gave a very expansive interpretation to the statutory exception. The statutory exception is set forth in 45-955 providing that a private employer may prohibit an employee from transporting or storing a firearm in a vehicle in a parking lot or parking garage or other parking area the employer provides for employees to which access is restricted or limited through the use of a gate, security station, or other means restricting or limiting general public from access. He gave a very expansive interpretation of that statute and ultimately held that, and there are a couple of holdings, but probably the most important one is he held that, according to his view of the facts, not CalSonic, which had nothing to do with providing security or anything, but that Nissan, the owner of the entire premises, 1,000 acres worth of property out there, had limited access because their whole facility has limited access. He gave a lot of different grounds and he says, well, the parking lot must have limited access because the entire facility has these various devices that he went through. There's a problem of both of logic and of consistency with Mississippi precedent in his ruling as to the precedent of the Mississippi public policy. I want to refer the Court to two cases which I think are just extremely important on what would be the Mississippi policy on this type of argument that Judge Wingate has used. The first one is the Swindle case itself, and in the Swindle case, the Mississippi Supreme Court relied on a couple of things that are so crucial to this case, the Mississippi Constitution on the right to keep and bear arms. It's Mississippi constitutional provision setting forth Mississippi public policy. And the second was a Mississippi statute which says a person under Mississippi law can carry a firearm in his vehicle. They're two different statutes. One says while traveling and the other one is specifically directed to the court. That is Mississippi public policy. And it trumped Judge Savick, you may be particularly interested in this case because you were on both of these panels in the Parker case, which Your Honor may remember. But Your Honor had given a literal interpretation to an exception to an immunity provision of the statute, Section 5, in the Mississippi Supreme Court in Swindle. One of the reasons they gave for disagreeing with your interpretation is they were saying, well, this is contrary to the strong Mississippi public policy set forth in the Mississippi Constitution and the Mississippi statutes. So the Swindle case just indicates the strength with which Mississippi right to keep and bear arms is protected. But there's another case that's even stronger than that. It's not a case dealing with, it's cited in the brief, but it doesn't deal with parking lots, but it dealt with this situation, which Your Honor, I'm certain, is very familiar with. This was the Ward v. Cologne, 253 Southern 3rd, 265. It was decided while this case was under advisement by Judge Wingate. And this was a case where some judges had made a rule that no firearms in the courthouse for purposes of courtroom security. It reminds you of the situation we'd see downstairs every time the guards come in, you had to check for firearms. And Mississippi had a statute that if you have an enhanced carry permit, which is, by the way, which Plaintiff does have under Mississippi law, a statute gives you the right to carry a gun even into the courthouse. And the judges said, no, it's within our judicial authority and inherent power to provide for safety in the courthouse. And the Mississippi Supreme Court said, no, it's not, because that's contrary to the Mississippi Constitution on the right to keep and bear arms and to the separation of powers. Only the legislature could modify that. Can we talk about the text that the Mississippi legislature adopted? Because, I mean, the Mississippi legislature wrote this provision, and they could have written it however they wanted it. We have a different rule in Texas, for example, for this very same proposition about private parking lots that looks very different than the one Mississippi adopted. But the one they adopted says, what is it, security station, gate, or other means of limiting or restricting access to the parking area. And what I'm confused by is why the residual clause has to necessarily include physical barriers to access. So let me give you a hypothetical. Suppose there's no gate. Suppose there's no— I'm sorry, there isn't. In effect, there's not anything we would call a gate. I'm going to give you a hypothetical that's different than Mr. McIntyre's case. So there's no gate. There's no security station. In fact, you can just drive right into the parking lot. But there are signs that say no parking, no trespassing, employees only, et cetera. I understand from your brief you would say that's not a means of restricting access. But what if there's an armed guard with an AR-15 walking around enforcing the no parking policy? That's not a physical barrier, but ordinary people reading the text of this statute would certainly think it's restricting access to the parking area. Well, you could read it, Your Honor. If we had that hypothetical, of course, that's not before the court. But if you had such a hypothetical, I suppose an argument could be made that you would read other means to mean equally effective or equally effective. I guess you could maybe read it that way. But I don't think you can just read it. Well, let me give you another hypothetical. What if they had said we restrict access because we decided to build this in Madison County instead of Hines County? That's the way we made it safe. We built it secure and safe in this safe county, Madison County, instead of building it in the high-crime area of Hines County. Would that satisfy the statute? Well, I mean, my understanding of your position on the residual clause in subsection 2 is that it has to be a physical barrier to access, that non-physical barriers wouldn't satisfy, for example, a guard. That is my understanding. That's what the other district court judges have reached that conclusion based on rules of statutory construction. That's the conclusion that they've reached. But if you don't have that rule, then the exception just swallows up the statute because an employer can say anything. He doesn't have to say I'll put an armed guard there. In this case, in fact, the only restricted access that the plaintiff goes by is a no trespassing sign. What if there's no guard with a gun, but instead they do what they do in Austin, Texas, which is they just put a great big, what do you call it, the thing they bolt onto your hubcap so you can't drive, and they put a big sign that says you've been booted on your car. I mean, that's obviously not physical access to the parking area. You're free to go in there, but they're going to boot your car if you don't have permission to be there. It just strikes me that the way the Mississippi legislature drafted that residual clause, there's nothing in there that requires it to be limited to physical barriers to entry to the parking lot. No, sir, but the only thing I can say about that, Your Honor, your Honor's interpretation just leaves it open to the employer to do an effective repeal of it because they can take the thing you said, To me it would be a logical reading to say if you wanted to read into the statute, means substantially equivalent to those things. That might do it. But the things that we're talking about, a no trespassing sign, I mean, the only thing he passed when he goes through there, according to plaintiff's evidence, is a no trespassing sign. Well, and a nine-foot wire gate with razor wire on the top. That's what's very confusing about it, Your Honor. It is confusing to look at the brief to try to figure this out, but the easiest way to look at it is the diagram on page 412 of the record. And if you come in from north to south, there's an open, the thing's a four-lane highway. It's called Nissan Parkway. You know, their argument is that they're invisible out there or whatever. This huge Nissan facility's visible from the highway. But they come in from north to south. There's confusion among the witnesses about what gate one refers to, but it's obvious that it refers to an opening in the fence that surrounds the property. You drive through the opening. There's nothing to keep you from driving right through this opening in the fence. It's a four-lane highway called Nissan Parkway up until it turns into what some witnesses call Access Road. One witness, their personnel manager, says it's all part of Nissan Parkway. But most of them said it's Access Road they turn on to. And they drive, after they enter Access Road, they drive 75 yards and go to what's called gate 1A. There's a confusion, difference in interpretation of the witnesses about whether there's a gate there. Looking at the film, there's not actually a gate there. The only thing is there's an arm. What? An arm, a mechanical arm. According to our witnesses, including their personnel manager, I refer the court specifically to 542, an email that she wrote, that arm is always up, according to us. There is absolutely no physical barrier. There's nothing else between that and the time they enter the parking lot. How far is it from the access arm? That's Nissan's access arm. It's over a mile. I calculated that because he did a film after he was fired to show that there wasn't. And the film's four minutes long, so if you assume he's going 20 miles an hour, it's going to be a mile and a third. All the witnesses said they didn't know how far it was. It's just a long way. But the entrance point is a mile and a third to the parking lot. CalSonic, the employer in this case, does nothing whatever to prevent it. There's no controls whatever on the parking lot. There's nothing directed to the parking lot. All the things that he talks about, he says the main thing is there were two gates. There's a difference in facts in the testimony about whether it is what we would call a gate. The only thing there is a mechanical arm, but the defendants refer to it as a gate. But Nissan does nothing whatever to restrict access to the parking lot. So I'm reading the statute literally, and you have to restrict access to the parking lot, not the fact that Nissan restricts access to its whole corporate facility, and then incidentally that means that there's some limitation on entering the parking lot because the whole facility has a limitation. Would you accept a reading of the residual clause that doesn't include a physical barrier? Is there any non-physical barrier that you can imagine that would satisfy? A non-physical barrier? Well, let's see. Because the way I understand what you're saying is we have to infer the word physical. In this case, that's what you would have because the non-physical barrier is not actually a gate. It's an arm. And I've conceded that an arm, if the arm were kept down, would restrict access. It's equivalent to a gate. Well, that's physical. If there's a non-physical barrier. I can't imagine what it would be because these are physical barriers, and it says there are other means. So your interpretation, well, they can just post a security guard. They could, but they could also put a teeny-tiny sign out there that nobody could read and say, well, I thought somebody could read it, and it said no firearms. In fact, the parking case that we dealt with here was a case where there was a no firearms sign. It was hell not adequate. Your Honor, I want to address a little bit about Nissan's claim that it's not liable because it's not the employer. I've got a couple of minutes. The manufacturing handbook, the Nissan manufacturing handbook, is different from CalSonic's, and it's on page 504 of the record. This is Nissan's handbook. Possession of handguns inside a Nissan facility or inside a foreign trade zone. Now, the foreign trade zone is where you work. Once you park in the parking lot, you enter another fence. There's pictures of it. You do enter a fence there, and there's a big sign there, foreign trade zone. And so either in the parking lot or in the foreign trade zone will result in immediate termination. Nissan policies require termination. That that policy is binding on CalSonic is demonstrated by the on-site supplier license agreement. This is not a pageant over in the record, Your Honor. It was filed under seal. But paragraph 9 is on file with the court. In paragraph 9, it says that the contractor's employees are bound by the Nissan policies, paragraph 9. So from CalSonic's point of view, if they weren't totally dependent on their business from Nissan, I think they would be saying, and if the court were to let Nissan out of this before a jury, they would be saying, we couldn't do anything about it. This was Nissan policy. We were required to follow Nissan policies. So they're required to. A couple of witnesses testified it was their understanding they had to. So CalSonic had no, they didn't do anything to the parking lot, but they couldn't have. This is Nissan's parking lot under the license agreement. So, Your Honor, we, the interpretation, I guess I'll finish with this, the interpretation Judge Wingate gave, that is that the means that the manufacturer provides, the overall contractor provides, whatever they are, are sufficient because by happenstance, the contractor who's the employer, by happenstance, that happens to also affect the limitations into the parking lot is sufficient. That's just a novel interpretation of Mississippi law, and it's not supported by the Mississippi public policy protecting the right to keep their owns. Thank you. Good morning. For CalSonic, we're taking 10 minutes and 10 minutes reserved for Nissan. Two issues I'd like to focus on this morning. One, Your Honor asked several questions about the interpretation of the statutory exception. It's CalSonic's position that the previous decisions don't require that other means has to be the same physical structure as a gate or a security station. Judge Wingate held below that he was satisfied that the parking lot created by Nissan and the security provisions around it met the statutory exemption. And there is some disconnect, I think, in terms of some of the pictures the counsel was talking about in the restriction. The nine-foot-high fence topped with barbed wire covers the entire facility all the way around, such that, Judge Wingate posed, in and of itself, there's an argument to say that the enclosure is a workplace. There's a difference in absolute express prohibition on bringing weapons into the workplace as opposed to the parking lot exception, which is what we're focused on. Any more so than the walls around this courtroom with a gate coming in and a drop arm equivalent restrict the general public's access to this property. And that's the focus point of the statute is it's not Mr. McIntyre or the other contractor employees. It's the general public's access to this property has to be restricted by a gate, which it had, security station, which it had, or other means that restrict or limit the general public's access to the property. And in this case, other means primarily relies upon the fence that goes all the way around the property and where the first gate is, gate A, before you go to 1A, and the parking lot is completely hidden from view back behind the Nissan facility. And it's our position that to limit other means to solely something like a gate or like a security station ignores the numerous methods and components that are available to an employer to restrict their property. No trespassing signs posted where the gate is, where a drop arm is. The fence signs warning of video surveillance. Security station, you can have patrols from that station that go around the premises, including this parking lot, outside contractor, Wayland Security, whose job it is is to ensure that the parking lots are used solely by the contractors and Nissan employees and to eject trespassers. Judge Wingate looked at all those factors and determined that clearly the parking lot, which is in the facility, which is Nissan's facility, and CalSonic is a licensed contractor, met those restrictions and met those requirements. And there's not a basis to go backwards with the language and say it only has to be a gate or security station when you have other means between manpower, video surveillance, the fence, and patrol that leads in addition to the gate and security station in place. Let me ask you about the video surveillance. All I saw on the record is that there is a camera focused on this gate 1A, but no evidence that clearly indicates any other part of the route back to 1B or the parking lot itself has video surveillance. Do you agree that's as much as the record shows? I don't. With all due respect, I don't necessarily agree with that. There are several signs posting that the property is under video surveillance. There's also a regular patrol. I'm looking at what are the restrictions and the limitations that are physically there that are shown in this record. That may not be a fair view of the record, but that's all I've found. Insofar as the—with my knowledge, I did not look at the whole record to be fair. My law clerk may not have looked at the whole record. Also, the security guards. What is in the record as to the actual route that the plaintiff would have taken, the actual parking lot 1B? What's in the record about what security guards or periodic surveillance there would have been physically of that? What's in the record is that the security guards regularly patrolled the entire property, including parking lot 1B, where McIntyre— Is that what the testimony was? The testimony actually say, including 1B? Yes. And that Mr. McIntyre in his deposition even acknowledged to call them the little electric car that they had. So they have a physical presence that patrols the parking lot. And the entire facility, which includes the parking lot, 24 hours a day, 365 days a year. That's in the record. What's the extent of the patrol? Excuse me? The extent? What's the extent of the patrol? I believe that— I mean, they look to make sure that every car that's parked there is an employee car. The first part of that is it's a regular patrol. The second part of that is the contract between Nissan and Wayland Security charges them with the responsibility to patrol the premises, the parking lot, and to remove anybody who is not properly on site, i.e., any trespassers. And how do they tell if there's a trespasser? That's a good question, Your Honor. A security guard presumably is going to ask a question to someone who's not there, who is— If you go back in the 1B, you're going to go into work. You leave your car. You walk into the entryway. You go in the facility. You're not loitering. People who would be in the parking lot area who are not entering the building and could not possibly enter the building because they don't have the requirements for a badge for have access would be questioned about why are they there and what's their purpose. But if you don't see that person enter, how do you know that the car that's parked there belongs to an employee as opposed to a trespasser? A security station is going to rely on its patrols, and it's going to rely on video surveillance, and it's going to rely on the fact that the primary time— Stickers? Are there stickers for the cars? Excuse me? No, I don't believe there are. Nothing in the record on that. The testimony is contrary to McIntyre's statement that the drop arm was always up. The testimony from security guards who are the people outside all day long during the shifts where the drop arm was up primarily during shift change. You have hundreds, if not a thousand, employees coming in and out of the property, and they had previous experience that when they were required to badge in, they would back up, they would have accidents, and people were late to work, so they compromised and left the drop arm up while shift change was in place. So whatever Mr. McIntyre saw coming and going to work couldn't possibly equate that the drop arm didn't function while he's inside with no viewpoint of what's going on for the 8 to 10 hours a day that he's working, and the security guards testified that they were operable, and that's the premise of the way they were used. Let me ask you about the two specific things mentioned in the statute and how you argue that this part of it is met. The use of a gate that restricts or limits. If this arm is constantly up and we decide that it actually is contested on summary judgment during a wine dispute, so just accept as a premise that there's a dispute of whether the arm might constantly be up. Could the mere existence of the fence all the way around with a gate, an opening more than a gate, I would say, if the arm is already always up, is that in itself sufficient to comply with the statute, or do you need some sort of barrier before it would be? I'm just talking about that, not all the other things that are going on out there. In this case, you have the gate, and in some sense— What do you mean by a gate? The metal fence comes, and there's a sliding gate that would close, an electronic gate, and that's open for the first access in. Insofar as security interfering with entrance, I haven't heard any argument that that sliding gate is— There's a gate that's open, and that's gate A for the main entry. Okay. But I would interpret, insofar as limiting and restricting access, that by gate, certainly one way to interpret what the legislature was up to here is they actually meant that is something that would interfere with access. Correct. It seems to me the only thing that would interfere with access that you're talking about is the arm that comes down or up. So I'm just asking if that arm is, in fact, you know who I speak to, in fact, always up, is that a relevant gate for purposes of this statute? I say it is, Your Honor, for two reasons. One is McIntyre's evidence that it was always up isn't feasible. He can't testify as to what that gate did, contrary to the security guard's testimony, while he's in that facility eight to ten hours a day. Let's get back past your factual argument. I'm looking at a legal argument. Judge Wingate was satisfied that, in and of itself, the existence of the gate and the drop arm satisfied the statutory exception. And I think the focal point has to be not what McIntyre saw coming into work and leaving work every day. It's what the general public would be communicating to them as to their ability to access the property. And it's clearly limited and restricted. And the statute says gate, security station, or other means, all in the alternative. And if you take the other means in combination with this drop arm, clearly the general public would know that their access to this property was limited. You know, the Mississippi courts have found cases that said just posting the properties and no trespass was sufficient to advise the person that they should not be on the property. And the company or the parking lot where they got injured was sufficient to relieve them of liability. So clearly in this scenario, this is a case, as the Cherry case recognized, is the most extensive to date on this issue of whether or not a parking lot is adequately restricted or limited as relates to the general public's access to this property. And we would respond fully that that drop arm meets those terms. Thank you, Counselor. If I can take just a minute to talk about Mr. McIntyre. Every minute you take, we're going to go back to the other. Okay. Thank you very much. Good morning, Your Honors. May it please the Court. I'm Walter Brandon. It's my privilege to represent Nissan today. Regardless of any other issue in this case or any other matter to be decided, Your Honors, summary judgment was properly granted to Nissan because Nissan did not employ or discharge Mr. McIntyre. It's undisputed that Mr. McIntyre was employed and discharged by CalSonic and not by Nissan, and Mr. Wade just agreed with that. Nissan and CalSonic are entirely separate entities with separate employees and separate management. The only claim asserted in this case is for wrongful discharge under Mississippi law. There was a tortious interference claim first asserted and was withdrawn in the lower court. The only claim is wrongful discharge. Mississippi law limits the claim for wrongful discharge to one cognizable only between the discharged employee and the employee who discharged that employee. That was first stated in the McGarn case, of course, with which the Court is familiar. It was conclusively established in the DiCarlo case, which we have cited in our brief. The Swindle case, which addresses the cause of action for wrongful discharge at issue here, expressly incorporates the McGarn framework to the wrongful discharge claim at issue in this case. There's never been a wrongful discharge claim under Mississippi law from any federal court or state court that has recognized a claim for wrongful discharge against a third party. So regardless of any other factor, Nissan, the summary judgment as to Nissan, should be affirmed for that reason alone, and that ends the case as to Nissan. Further, even if the statutory construction about against whom it will permit a claim were relevant, it's clear that Mississippi's code annotated 45955 also limits its application in the private sector context  There has been a reference to the term person in Section 1. The term person is utilized in Section 1 because Section 1 also applies to public employers in addition to private employers. Public employers are different. There may be constitutional issues associated with people who visit those facilities. Public employers may employ other than employees or other than employees may work at public sector facilities, political appointees, elected officials, and others. But the statute can only be read with regard to private sector employers to encompass a claim by the discharged employee against the employee who did the discharging. Of course, had the legislature intended to broaden that, it could have done so. We've cited other statutes in other states where the court, the legislature there, uses the term property owner, tenant, landlord, business entity, person, including but not limited to an employer. The fact that the legislature did not do that can only mean that in the private sector, this statute reaches the employer and its employee. No federal or state case is ever held differently. And in any event, and importantly, even if this statute did permit some sort of a wrongful discharge claim against a third party, and we say that it does not, it could not be wrongful discharge because of what I just said earlier. It would have to be a third party claim, and there is no such claim here. Also, a summary judgment was appropriate as to Nissan because Nissan took no action to discharge Mr. McIntyre, certainly, since it didn't employ him, or to cause CalSonic to do so. The argument about the Nissan policy is wrong. Mr. Wade respectfully referenced the policy, the wrong policy. The policy regarding the foreign trade zone is not applicable here because this parking lot was not in a foreign trade zone. The parking lot was outside the foreign trade zone. The parking lot is not inside a Nissan facility, technically, like inside the brick and mortar building, although Judge Wingate, we believe, correctly held that the parking lot was within the workplace itself, secured by the means. The policy at issue for this case is this policy. Guns or other weapons are prohibited on Nissan property, including the parking lot, training center, or while performing work for Nissan off-company premises, except to the extent allowed by law. So Nissan's policy is not a mandatory discharge or a mandatory no-guns policy. CalSonic had a judgment to make if, in fact, CalSonic applied Nissan's policy. CalSonic had its own mandatory no-weapons policy. It had a workplace violence policy that precluded weapons. So the notion that it had to apply Nissan's policy is in itself suspect. But let's assume that it did. The policy is not a mandatory prohibition, so it could not have had the effect of causing the discharge as far as the Nissan policy is concerned. It requires a judgment based on the circumstances at the time. It requires a judgment based on the law at the time. CalSonic, in consultation with its own decision-makers and counsel, made that judgment. If it was following our policy, then they made that judgment. There's no proof in the record that Nissan would have attempted to disturb that judgment if they had decided to keep Mr. McIntyre. So this notion that Nissan's policy left CalSonic no choice is just simply wrong. Mr. Brown, is there anything in the record about interaction between the two defendants before the termination, that Nissan became aware that there was contact, e-mails, phone calls? Is there anything like that in the record? Yes, sir. There are two things. Number one, the call about the gun came to the contracted Wayland security officers. They called Nissan's security manager at the plant. Nissan's security manager, Mark Jackson, referred it to Nissan's supplier liaison, Mark Graham. Mark Graham then turned and handed the complaint to CalSonic, the employer, and said, there's a report that one of your employees has a gun in the parking lot. Would you please go see about it? Now, what are you taking that from, a letter, an e-mail, or whatever? The combined affidavits of Graham and Jackson and really from several sources, Your Honor. The only other thing in the record, Your Honor, is this. CalSonic's legal officer, Mr. Vick, reached out to Nissan and said, we're being told that these arms are always up. And they reached out to Nissan to find out about that, number one. And number two, to get Nissan's opinion about whether the lot was secured within the meaning of Section 2. Of course, there was no swindle at this time. It was all brand new. And so the response was, it's news to us the arms are always up. They're supposed to be up only around shift changes and otherwise down. And it is our view that the lot is secured within the meaning of the law. But that's Nissan's opinion. The e-mail didn't mention Mr. McIntyre, didn't mention any decision about Mr. McIntyre, what to do with Mr. McIntyre, or anything else about Mr. McIntyre. So those are the two things. And so, in any event, the remaining evidence that they offer is speculation among CalSonic employees or security guards about what would Nissan do, what would Nissan want. None of it is sufficient to show that Nissan actually did anything. Ms. Courtney's speculation about whether he'd be allowed back on the property is just that. There's no evidence that Nissan ever told him not to let him back on the property. Mr. Todd Mangrum is quoted in here. He did not work for Nissan. He can say nothing that binds Nissan. And Ms. Draga's e-mail regarding saying that Mark, their brief says, the appellant's brief says, it says Mark Graham has been in the midst of terminating McIntyre. That's not what the e-mail says. She says Mark Graham has been in the midst of this. And, of course, Mr. Graham had relayed the claim, the initial complaint to her. But amidst of this is vague, insufficient crediting action by Nissan. In the remaining time that I have, I want to say, discuss the security means just a minute. The security means in place at this plant did satisfy Section 2 of the statute. This physical barrier business got started with Parker. Parker never considered the two most important words in the statute, restricted or limited. And then it went about to require means that contemplate precluded, prevented. That's not what the statute requires. The statute only requires that access be limited. And that is different from precluded and prohibited. So Parker was misguided in the first place. The drop arm at Gate 1A was down, according to the eyewitness testimony, except around shift change. So that means it was up about 9 or 10 hours a day and down 13 or 14 hours a day. That is a limitation on public access. The public can't get through there at that time. And it is limited in that way. The next thing is the property line fence that surrounded the whole place, including the parking lot. That limited public access for most of the perimeter. The Central Security Office and the Roving Security. How did it limit? Did somebody check who was going through? Well, I'm saying there was a gate, certainly, and then there was the drop arm behind the gate. It didn't limit it there, but I'm saying the perimeter. You couldn't get to it from the backside of the plant or anywhere else. But no one was checking access. They don't have a badge or something to make sure? Yes, Your Honor. When the drop arm is down, they have to have a badge to get through. When it's up, they do not. You don't have to have a badge to get through opening the gate into the area? Not into the perimeter fence, but you do have to have a badge to badge through when the drop arm is down. The reason they had to have it up is because there were thousands of people literally coming in and out of this plant, and they cannot badge them all through or check them all and have everybody get to work on time. And so it was absolutely necessary to have that. And so we fully agree that the requirement of a physical barrier at the point of access is not required by the statute. The statute says limited, and that's exactly what it means. And certainly the no trespassing signs as well, Your Honor. If the public obeys those, as most will, they're not going to come in, and public access is limited. I see that my time is up, and I thank the Court. Your Honor, both counsel have made the claim that the arm, that our evidence about the arm being always up is not sufficient. I want to refer the Court not to what our client said, but what they said in an email. This is the personnel manager, page 542 of the record. This is what she said in her email at the time. We do not have to badge into the parking lot. After parking, we do have to badge through a gate. In other words, you park, and then you can go and walk into the work area or the foreign trade zone. Continue the email. As we come into the parking lot off of Nissan Parkway, notice she doesn't even make any distinction between Nissan Parkway, the four-lane highway, and the access road. There is an automatic gate where a badge could be used, but I have never seen it working since I have been parking in this lot. This is what the local personnel manager said. The plant manager said the same thing. So the fact is somebody's lying about that. They both can't be telling the truth, and that was up to the jury to decide who's telling the truth. There is no, Your Honor, there is no, a jury could reasonably find there is no limitation of access through the use of a gate. Of course, under our interpretation, there's not even a gate. A security station, which is way on the other side of the plant, it's in the security station when Your Honor looks at record, page number 412. At one time, they complied with the statute as to those parking lots that are in yellow. You have to have your electronic card lift according to him, according to all the evidence. As to those parking lots, you have to have, they have limited access. You have to use your Nissan card and open arms to get into them. You also pass the security gate, the security guard gate in the center of the front. They're right adjacent to where they're entering. But this parking lot, the jury could reasonably find, is not limited at all, unless Your Honor says, well, as a matter of law, a no trespassing sign is a limitation of access. And we think that's just taking an extreme version of the statute that shouldn't be endorsed in view of the strong public policy on the right to keep and bear arms. Oh, here's another thing. They're saying Mr. McIntyre's testimony is suspect because he doesn't know about all the times. When you look at the film, if Your Honor looks at that tape he made, it's obvious a shift change is not going on then. There's only one other car you ever see on the road. He said it was not during a shift change. It was after 10. And he also didn't work a regular shift. He was a maintenance man. He came in an hour, hour and a half before the shift started and left an hour, an hour and a half later. He had to make sure the machines were working. So he was in a position to know, as was the plant manager and the personnel manager. But at some point a jury has to decide things. Your Honor, as you can tell from both sides' argument in this case, there's a lot of confusion and uncertainty about exactly what's going on here. They do have some signs, but they're not specific about where they are except that there's a no trespassing sign that we agree you have to pass a no trespassing sign when you enter the gate. But the opening, just to say that there's a gate that's always open according to our proof, is always open, that doesn't restrict access to anything. And the statute literally requires that there be restricted access to the parking lot. Taking the evidence in the light of the most favorable plaintiff, there is no restriction whatever on access to the parking lot unless you say, well, on the way you have to What does limited mean? I would say anything could be limited. The fact that it's a big, huge, Nissan plant, I guess, could be limited. The statute says restricting or limiting, so limiting means something other than restricting, doesn't it? So what does it mean? It could mean the same thing. I don't know what or means there. Could it mean restricted is the same thing? That's a subtle name. I can't answer that question, Your Honor. I really don't know the answer to Your Honor's question. All I'm saying is it refers to the access to the parking lot being restricted or limited. That's all it refers to. If you take the evidence in the light of the most favorable plaintiff, there is no limitation in any way of access to the parking lot unless you say that no trespassing sign that you have to pose to qualify, that you have to pass. There are a bunch of other signs now in the record that they've given affidavits that are located somewhere along the premises. They talk about no trespassing signs at four places or whatever at the other gates. Those are places where you used to park. At one time, he parked at those front parking lots where you could only get access through the arm, using your card to get into the parking lots, and you had to pass security gates. They're claiming, Your Honor, that we had to do this because of traffic concerns. There's no evidence that the others, the parking lots in front, according to them, you have to use your card to get into them. There are a bunch more employees that work in those front parking lots for all of them than the back parking lots, so the jury doesn't have to believe that. Okay, counsel, we have your argument. Thank you, Your Honor. The court will take a brief recess.